May it please the Court, David Berman for the Yellow Pages Publishers. I would like to reserve three minutes if I could. Like all publications, largely or completely supported by ads, magazines, newspapers, free TV, almost everything on the Internet, Yellow Pages can attract ads only by offering readers information of value and convincing at least most people to accept and keep those books, at least just in case. The value, as our declarations and our examples showed, and the declarations are relatively short. If you haven't had a chance to read them, I would strongly encourage you to take the time to do that. I think you will be convinced by them that we at least created a factual issue as to the value of the noncommercial content, as to the fact that we make great efforts to protect and to not make mistaken deliveries and to protect privacy. And I would encourage you to look at those. The value that we talk about in there, and Professor Baldesty, the only expert in the case, talks about is the noncommercial information such as emergency and other important service, consumer rights and remedies, business contact information, and even the ads themselves, organized in a way that allows comparison of competitors. If all ads were banned from Yellow Pages, the most extreme possible application of the commercial speech doctrine, the faction of the city's constituents that sought the ordinance we challenge would still be concerned with unwelcome deliveries of somewhat thinner directories that they still would not view as sufficiently worthy. And that's because the telephone company is legally obligated to produce such a document. That's correct. We are required not just to produce it, and we do it by contract on behalf of the telephone companies, but to deliver it to people, including the business listings. And if you look at the regulation we cited, it talks about the other information, the other consumer and community information that we need to include, and we go well beyond that. But if all ads were gone, the city would still have the same objection. And what that shows is that ads, the true commercial speech, they are the hook, the excuse, not the objective of this regulation. That alone indicts application of the commercial speech doctrine. Well, just a minute. I guess I don't understand exactly what you've said. As I understand it, you are not a local exchange carrier. We are acting under contract. Many of our members are acting under contract. You've made a contract with the local exchange carriers to do something they are supposed to do. Well, the regulation allows them to contract. Well, I wasn't trying to challenge that they didn't contract with you. But yourself, you're not necessarily under any obligation to publish or distribute the listings. You just enter into a contract to do it with what you want to put together. Correct. At least it shows the value of the information that we put in the book, in addition to ads which are less than a third of the book. So, in effect, could we suggest that, or is it possible, is it entirely possible to publish the listings and the public information unaccompanied by the Yellow Pages? By the ads or the Yellow Pages? Correct. And the same... And isn't it also entirely possible to publish the advertising without the listings?  And the same unwelcomeness... If that's the case, why isn't Board of Trustees of State University of New York versus Fox right on point? It's not right on point, Your Honor. Fox specifically says that it makes a very important difference when the publisher is not the advertiser or seller. In Fox, the advertiser or seller added a little bit of noncommercial content in, and the court said, well, we still generally treat that as a proposal of commercial speech. When the advertiser, the seller, is adding a little noncommercial content. Here, the publisher chooses the noncommercial content, and it supports it by ads. Very different. And Fox, remember, also says... We're after you. You're the one that's here. The LEC is not here. So you could go forward and do whatever you want to do with your advertising, and you wouldn't have to have any of the information the LEC wants you to make, which you contract to make, and then put out with your advertising. As could the Seattle Times, which doesn't have a contract with LECs, or free newspapers like The Stranger, or all of the 98% of what the city calls unwanted material distributed to homes that the city does nothing about here. They don't have any contractual or regulatory obligation at all. Put aside the regulatory obligation and look just as what we have. We have, as in Fox, some noncommercial content, but unlike Fox, it is a lot more noncommercial content, and we choose it, and we publish. And Fox, in fact, remands for an overbreadth trial to look at the burden on that noncommercial content. Here, the district court doesn't even address the burden on the noncommercial content. A significant difference. And remember that last month in the Sorrell case, the Supreme Court points out that the purpose of the commercial speech doctrine is to deal with the commercial nature, to control abuses of sales efforts. That is not what this case is about. It's this case about a question of fact as to whether or as to exactly what the situation here is as such that, and we're not talking about summary judgment here. We're talking about a preliminary injunction. What we're really talking about is it likely to succeed on the merits, and therefore, given that it's a question of fact exactly what the yellow pages or your particular situation may be, that it isn't necessarily likely to succeed. We ought to wait for a trial. No, Your Honor. We say there were two fundamental errors of law by the district court. The first was applying commercial speech doctrine to the whole of the publication and forgetting about the bulk of it that was noncommercial communication, and applying a commercial speech test. Remember that the Supreme Court created in Bolger and Fox to deal with advertisers and sellers who throw in a little bit of noncommercial content. This case is very different. This is a government regulation that expressly targets our publication on the basis of the listings, not the ads. But so long as any advertising is included, that's the hook to try to regulate it. But the ads are not by the publisher. They're not for products the publisher sells. The regulation is not aimed at the ads. And, in fact, the ads make up much less than a third, very similar, as our expert, Undisputed, points out to newspapers and magazines. That is an error of law. The second error of law was to apply basically what amounts to a rational relationship test. And this does get to your factual question. The district court said basically in the preliminary injunction ruling and ultimately in the summary judgment ruling, I'm just going to accept on its face the legislative history. I see that a bunch of complaints were made. But if you look at our declarations, you will see that although the burden wasn't on us and the video games case makes it clear that what the state or what the city here put forward could not have satisfied its burden, but we put in evidence that we were very careful to avoid mistaken deliveries, that they happen infrequently. We specifically contested much of the complaints that were in the legislative record. And the district court said, I accept the legislative record. The legislature could have concluded from that record that there was a problem here. No quantification. That basically makes judicial review and the burden being on the city meaningless. Because it says if the legislature believed it, I as the court am not going to allow you to second guess it. And I am not going to second guess it. And intermediate scrutiny. Again, we're not in a summary judgment situation here. We're in a preliminary injunction situation. We're trying to measure who is likely to succeed, who would be irreparably injured, whether the issuance of the injunction will not substantially injure the other parties, and whether the injunction is in the public interest. We've got four tests here. And it seems to me that all you've done is argue very succinctly and properly that there's a question of fact to be done, that the court went too far on a question of fact, and therefore he's wrong. But give me a chance and I'll succeed. I guess he was saying at this particular point he thinks it's unlikely you'll succeed, therefore no preliminary injunction. But the case proceeds. It's just a matter of whether there's a preliminary injunction or not. And he could only reach that conclusion by making the fundamental error of law of applying the commercial speech doctrine. And that is improper here, where the burden falls significantly on noncommercial speech. It targets the whole publication. It makes the commercial and the noncommercial inextricably entwined. It puts a burden on noncommercial speech. And in that case, the least restrictive alternative analysis applies. It is the city that has the burden, even if it were commercial speech doctrine that applies here, to show the facts. And on a preliminary injunction standard where First Amendment values are unquestionably at stake, that burden has to be satisfied by them before the ordinance should be allowed to go into effect and deny those First Amendment interests. What is irreparable injury? The irreparable injury is having to apply for a license to speak. The irreparable injury is being compelled to pay a tax for speaking. Well, there's no dispute they'll give you the license if you applied for it. I assume you did because you've already published under the ordinance. At least one of the plaintiffs has. But there are others who are still going to face this in the future. And there is no question under the First Amendment that having to get a license from the government to speak is an irreparable injury. Moreover, we are compelled to pay a tax. You got the license. You have published. One, Dex has. The others still face that, and that's why there's a very live question as to the preliminary injunction while the case proceeds. No, no, but all I'm suggesting is that you get the license for asking for it. Right. And the only reason they give a license is so that they can threaten the death penalty of taking it away. So that irreparable injury possibility is still out there. The irreparable injury of having to say what they want, which is to discourage use of Yellow Pages, telling us we have to pay for their ads to discourage Yellow Pages, telling us we have to publish on our cover discouraging use of Yellow Pages. Well, the payment part you would presumably get back if you ultimately won. Correct. So as far as I can see so far, the permit they give you for the asking, you have to pay a tax in effect, which you would get back if you won. But the tax is used to speak against private free speech, the government using that money to speak against our free speech. I thought it was being used to support the registry. Half of it is being used to support the registry. The record shows clearly that half of it is used to advertise against using Yellow Pages, and that is an irreparable injury that happens. The city doesn't claim they would have made those ads with their own money. They want to discriminatorily take the money from us and speak against us. That is the Sorrell case decided by the Supreme Court last month, in which it says even when you come to marketing information, you cannot discriminate on a content basis, and you cannot try to discourage communication such as this ordinance does. So it's the part that forces you to pay for ads, to tell people not to use your publication. And to do it on our cover, to compel us to speak on our own cover, to say encourage people to go to the city's website. The cover, encourage, or it says here's how you could opt out. Is that the same thing as encouraging opting out? The city clearly was not satisfied with the fact that people who were so motivated could go to our websites and opt out. The record shows that we honor those requests, that we carefully protect privacy when we deliver books, and that the handful of- I'm not quarreling with that. I'm focusing. You said that the city forces you to encourage not using the publication. The announcement that I understood is placed on the front cover is at least somewhat more neutral than that. It tells you how to opt out of the city's system. It doesn't say don't ever look at this book again. If the city were satisfied with people simply using their own initiatives to decide to opt out, it wouldn't have had to require these extra messages. Clearly it wanted- But if your system is effective, then this isn't going to change anything. That's a different question. The effectiveness of the system, which even Mr. Lilly, the director of the Seattle agency involved, said was a pretty good opt-out system, and we proved that in the record, that is a different question about once you get there, if it works. But what the city wants is to encourage more people to use it. That's where I'm pausing, because I don't see the city's announcement as affirmatively encouraging. It's telling someone how to opt out. It may not produce any better results than the system you've already offered, but I just don't see the affirmative encouragement that you're telling me is there. Why would they do it if people couldn't do it on their own? Because they think, perhaps falsely, that your system doesn't work, because they get these complaints from people. I mean, I read the e-mails, and I don't put evidentiary stock in it, but there's a basis for them to say, well, gee, people say, I tried to opt out, I went to Dex Knows, I said never again, and next week, look what shows up in my doorstep. If the city imposed a non-content discriminatory, reasonable time, place, and manner system to assure that we honored opt-outs, that would be a very different case than this. When you say non-content discriminatory, do you mean that you're the only one who's selected for this opt-out and not other publications? Not the 50 or more times paper that the city says is delivered unwanted to the scoops of Seattle residents. None of those were selected for this system, and again, the Sorrell case says that that kind of content discrimination, even with respect to marketing information, and the Discovery Network case make it very clear that that kind of content discrimination is invalid. Again, no case goes as far as this did, and as a matter of law, the city is in error when it says you should consider profit motive. The First Amendment, as the Supreme Court has made clear, is concerned with the objective speech, not what subjectively motivates that speech. The district court rejected that profit motive, but it said, well, even though I'm going well beyond the Supreme Court's cases, I'm using common sense, and I'm only going to go beyond them in some circumstances, but that's undefined circumstances, and that sort of vague test would not be accepted for a legislature to use. It certainly shouldn't be accepted for a court to use to decide what's going to be protected by the First Amendment and what isn't. It's often the case that decisions on a motion for a preliminary injunction really end the case, that it really becomes case dispositive. Is that true here? Are there any issues? What would be tried if you got the preliminary injunction? I mean, are we dealing with something the equivalent of summary judgment? Effectively, we are. The court made it clear that it was really relying upon its legal conclusion as to that this is subject only to commercial speech despite the incredible burden on the noncommercial part, and when it applied the commercial speech standard, it applied it wrong as a matter of law by never applying any sort of analysis as to whether you could have accomplished this control of mistaken delivery without burdening all of that noncommercial speech, and whether it is disqualifying that you didn't apply this without a content discriminatory basis. Those are errors of law. We should have won on the preliminary injunction and on the summary judgment, and the district court should be reversed. I think the district court, once it is reversed, will take that into account in reconsidering its summary judgment ruling. Wes, are there any further questions? Apparently not. Thank you for the argument. We helped take you over, so we'll still give you a couple minutes for rebuttal. Thank you. So you should listen over the next 15 minutes. You may be called upon. And we'll hear from the city. Good morning. May it please the court. Jessica Goldman on behalf of the city of Seattle and Ray Hoffman. The Seattle residents have a right to- Why don't you just consent to staying the enforcement pending a trial? The city- This has been going on forever, so it will go on for another six months. Your Honor, as the court may know, the district court granted our motion for summary judgment and has dismissed the First Amendment claims. So at this point, there is no motivation for the city of Seattle to agree to a stay. It has invested heavily in making this system work, and the system that it is seeking to enforce here is- Their arguments are not frivolous. I mean, why force a hasty adjudication of these issues? Your Honor, the purpose of a preliminary injunction motion- Now, you could lose the case up here for good because it often happens that our preliminary injunction motions can, in the end, result in what amounts to a case dispositive determination. Your Honor, we are the respondents here, so it was not our election to bring this matter before the court. I understand your point, nonetheless. The city of Seattle has a strong interest here in ensuring that the public will is observed and that the waste issue is addressed. And agreeing to an injunction- I don't understand. There are many publications that are given out to which your ordinance doesn't apply. It only applies to the Yellow Pages book, and ironically, a publication which- They're obligated to print a directory by the state. They contract that out to the Bexmex, who agrees to do it, I assume for nothing, and makes up the cost of the publication by selling ads. Why isn't this a form of discrimination? Your Honor, the purpose of the statutes are two. One is to effectuate the privacy interests of residents, and one is to- How is the privacy of residents effectuated? I don't understand that at all. When I find these books on my doorstep, I don't think my privacy has been violated any more than when I find the flyer from a local restaurant or takeout place. I mean, I don't understand that argument at all. Under Rowan v. the Post Office and the many, many cases that have come since, both in the Ninth Circuit and the U.S. Supreme Court, it has been repeatedly reaffirmed that residents do have an interest, and it's a significant interest in privacy at their doorsteps, in preventing speech being directed at them that they don't wish to receive. The law requires the phone company to put out a directory once a year. I'm also mystified by the privacy justification. A directory is going to show up once a year. How does what DECCS is doing in attaching yellow pages to the directory, a further invasion of privacy? Your Honor, currently the way the system works, as run by DECCS, is they permit individuals to opt out of the delivery of the mandated LEC speech. So they right now are certainly encouraging their recipients not to get that piece. I wouldn't say encouraging, but facilitating the desire. I'll take that correction, Your Honor. For many, many years, the information that was required to be published here by the LECS was published by the LECS, and it was published without advertising. That is one of the requirements that state law imposes on the phone companies to allow them the right to provide phone services, which is a lucrative service that is authorized by statute in Washington State and by federal law, the requirement to provide. So how is there a greater intrusion of privacy because there are yellow pages attached to the directory? Your Honor, we leave that decision here, and the ordinance leaves that decision here to the individuals. It's not a choice that the city is making. No, the city is justifying imposition of a significant burden. I mean, there's money involved. On the plaintiffs here, trying to justify it to protect the citizens' privacy, only the directory gets delivered anyway. I see zero improvement of the citizens' privacy rights through this ordinance. Your Honor, there is no indication nor evidence whatsoever in the record that these companies would be delivering the LECS information were it not for the fact that they've concluded that it's a lucrative mechanism. The phone company has to. Your Honor, and that's a matter of state law. So we have the same problem. A directory is going to get delivered once a year. How does it make it worse to have yellow pages attached to it? Which enables them to pay for the cost of complying with state law. Your Honor, they are not required to comply with state law. They are using that as a mechanism to fund the commercial speech, which is their purpose for existing, and the speech that they wish to convey to individuals. Their experts and the documents that they have submitted make plain that they realize that this is a very useful mechanism for them to attach to. There's no indication whatsoever. Of course, but they're required to do it, and nothing in state law prohibits them from making up the cost of compliance with selling ads. Your Honor, in the commercial speech context, the courts, both the U.S. Supreme Court and the Ninth Circuit, have made clear that individuals have a choice about whether speech may be delivered to their homes. And in this case, there is no... State law requires the directory. It's going to show up once a year. And the motivation here of this ordinance is to protect privacy interests that have been communicated and advocated both by the record of the Dex Company and the other yellow pages and their inability to comply with resident desires and the significant testimony that's been provided to the city council. There's been no evidence, not one iota of it, that there's any complaint by any resident of Seattle to receiving the white pages. So given that and given that this is... Then how does the intrusion really differ if the white pages are going to show up? I mean, the intrusion is somebody walking up to the doorstep, dropping down the doorstep, and leaving. So something's going to get dropped anyway. Where's the intrusion? Again, Your Honor, it's not... It's thicker than it would be, maybe. Is that the intrusion? It's a lot thicker, Your Honor. It's a three-pound book. If you look at the information that's supplied in the white pages, it's, you know, maybe a quarter of an inch. So that is a material difference here, given the city's interest in avoiding waste where there is no... Stop. See, that's where I want to get you. It seems to me privacy is just strictly a red herring here. Waste is really all this thing's about, which is fine. You only need one reason. But I can't figure out how privacy has anything to do with it. Now if you're getting back to waste, maybe that's something. But this isn't the only thing that shows up that takes up space. I mean, shopper-type newspapers, I don't know what they're like here, the one that we get, it's like wall-to-wall ads. It comes twice a week. It forms a stack a whole lot bigger than the phone book, and the ordinance does nothing about that, and the city apparently is not going to do anything about that. Well, Your Honor, I certainly can't speak to what the city is going to do. In the future, this has been a step in an iterative process addressing the concerns of waste largely here. Would it be any different if they mailed it? I mean, there's all sorts of junk mail that people get. Is it the dropping by them in terms of direct delivery, or would it matter if it were mailed through the post office in bulk mail? Your Honor, I think the issues would be very similar. And the record here that was presented to the district court indicates that the city contemplated that problem first. It considered the issue of junk mail being delivered, and equivalent to the opt-out systems that have been created for phone calling, has addressed that issue by lending its way to the state of Washington, which has been considering legislation on a statewide basis to address that issue in concert with other states. So right now there's no restriction on junk mail? Not that's being enforced by the city of Seattle. However, the city has created an opt-out system, not one that's enforced. If it's not enforced, then there might as well be no regulation. Your Honor, this is a commercial speech case, and in the context of commercial speech, it's evident that the legislative body has the right and the power to take steps incrementally to address issues. The premise of this is that it's commercial speech. I don't want to miss the opportunity to focus on that, because this seems to be, I understand the thrust of the argument, but I also understand this creature doesn't fit our prior cases or the Supreme Court's prior cases. I mean, it is true that the plaintiffs here are themselves not soliciting anybody to do business with them. What they are delivering is a bunch of advertisements, much as newspapers and magazines do. We are willing to say, without any question, newspapers and magazines aren't commercial speech, because we look to the editorial content. But there is editorial content here, too, content which the state requires to be prepared and delivered, so presumably is believed to have some value. So I try to figure out, well, yeah, I think of the yellow pages as being commercial, because I think of it as being ads. But when I try to articulate a distinction, I have a hard time, and that's really part of the challenge for you. What is it that really clearly makes this commercial, as opposed to noncommercial, because this doesn't fit the pattern of earlier cases that I've looked at? Your Honor, one correction I'd like to make in that is that there's no solicitation here by the plaintiffs. Their publications are replete with their own solicitations of their own. Oh, yeah, but the newspaper is always asking you to subscribe, too. I mean, the Seattle Times is filled with ads for the Seattle Times, but that doesn't make it less a noncommercial publication. The bulk of the yellow pages is not their solicitation. It's the ads they've gotten other people to pay for. That's the whole reason for it. With due respect, Your Honor, almost every other page of the yellow pages has an ad for the yellow page company on it. That is not something that you'll find in the Seattle Times, which was submitted to the district court for review. There might be one reference in there. What do you mean by that, an ad for the yellow page company? For example, the Dex company. If you look through the yellow page company, which I sadly have done multiple times, almost on every other page you will find a large 2x2, 2x3-inch ad for the services that Dex offers both online and for the services that it offers for advertising, inviting people to advertise in their publication. So those are ads that are directly, they are the speaker and the publisher for those ads. Of course, there are hundreds and hundreds of additional ads. That's not why anybody looks at the yellow pages. Those ads are there because they sell chunks of space, and whatever space doesn't get sold they use for their house ads. They'd be happy to have those ads replaced by somebody who's paying for an ad. That doesn't really define the character of the publication in a way that I can draw a clear line between it and the shopper newspaper. In fact, the shopper newspaper that hits our house a couple times a week, I can't imagine wanting to read the articles there, unless I happen to know the people whose picture is on the front page. But it's treated as a newspaper, and understandably so. What really makes this different? Well, Your Honor, in this case there's no evidence of any shopper newspapers or of any other publications being delivered to the homes of residents in this city. That was an important piece of... It's going to be an opportunity for me to move in and get a high-paying job, you know. We'd welcome you, Your Honor. The distinction, though, I think, the meat of your question, the distinction between a newspaper... You want us to define this as being commercial, so it comes under the Central Hudson and so forth. We have to articulate... If we're going to do that, we have to articulate a line. Line drawing is hard, and if we can't draw a line, then we have a hard time defending that result. And I understand the evidence in this case, but our opinion is going to be used in other circumstances and going to be reviewed by the people who grade our papers in other circumstances. So we need to be able to articulate a real difference between this publication and the publications which I suspect you would concede are entitled to full First Amendment protection. And I have a hard time understanding what that articulation is. Your Honor, that line has been drawn. That line has been drawn in the doctrine of inextricable intertwining. The notion here... There's no question here, Your Honor, that there is both commercial speech and non-commercial speech in the Yellow Pages. That was the case in the Supreme Court's case in Bolger, where a large pamphlet discussing public information and public health information included one reference to an advertiser. And the court held that that was inextricable intertwining because the purpose there of the advertiser was to advertise. That's the third prong of the bull. And the advertiser issued the publication and could style the editorial content in such a way as to promote the product that it was selling. Right. And, Your Honor, if you look, for example, at the case of billboards, which are legion in this circuit and before the U.S. Supreme Court, there's no question there that we're talking about commercial speech despite the fact that the billboard owner is typically not the speaker. So the fact that the advertiser and the publisher are not one in the same isn't relevant to the determination of what kind of speech you're dealing with there. Oh, the billboard doesn't contain anything but the advertisement. In this case, there is editorial content, which may be of, I can't even say of questionable value. I mean, there are things that people look into the white pages for because the law requires that you have white pages, and they look into the section in front that shows the diagrams of the stadium to see where the seats are. And that's selected by the publisher, not by the advertiser. And, Your Honor, the act of selecting what goes in has no bearing on what kind of speech you're talking about. It's the fact of the type of speech and its combination that is the essence of this inextricable intertwining test. Is there a reason why these two types of speech must, as a matter of law or as a matter, as the Supreme Court has said, of nature require to be published together? And that's simply, that's the crux of this case, Your Honor. And that is what the district court found, both in the preliminary injunction review and in the summary judgment, was that it was not inextricably intertwined. And as recently as this term, this year, Your Honor, the Ninth Circuit case in Hunt decided an inextricable intertwining case, and that case addressed the messages that were being conveyed by Shea Butter sellers in a public location and whether those two types of speech, the desire to sell Shea Butter, which was clearly a commercial transaction, and the religious historical information that was being supplied to explain where from whence came the Shea Butter attraction, were not inextricably intertwined. There was no requirement that these two pieces of speech had to be conveyed together. And because of that, what the commercial speech doctrine teaches us is that those publishers and those speakers have every right to that high First Amendment level speech, but they're not going to get the protections of the high First Amendment speech when they combine it with commercial speech. You may not be able to exercise your right to that speech to begin with if you're unable to pay for it. It costs money to exercise the right to speak, and they need to sell the ads to pay for that. I mean, this is not an instance like the case involving the advertisement for condoms where they put in some public health information as sort of an excuse to avoid regulation of the advertising component. I mean, I think they have to have it because otherwise it would make it more difficult and expensive for them to exercise what you would describe as the First Amendment part of their right. Well, Your Honor, if we go back to who is required here to speak, it's not the plaintiffs before you, Your Honor. It's the agents of the people who are. Suppose your argument wouldn't be any different if it were Quest that decided to put out the publication itself, and in order to absorb the cost of the publication, it put out the yellow pages and sold ads. You would be making the same argument here. That's correct. I'm making an additional argument. So they're essentially, you know, I think they have to be looked upon as no different from the principal who hired them to carry out the function. And the principal benefits because they're not absorbing any cost as a result of this arrangement. They get their obligation to the state is complied with at no cost to them. Your Honor, I do agree that they're very similar. I think there are additional reasons why these plaintiffs here are conveyors of commercial speech, and that's because they're not required to publish the speech that is the tail here wagging the dog. Seattle Times isn't required to publish either, but it does, and it pays for itself with the ads. I mean, Seattle only has one newspaper published now, presumably, because the other guy didn't get enough ads. So suppose somebody takes a phone book and, in addition or instead of the diagrams of theaters and stadiums, sticks in a few of the kind of articles that pop up in shop or newspapers. That's why I say I have difficulty understanding what's really different here. And, Your Honor, the issue here is, if we go back to Bolger, the third element of the Bolger test. You're not even trying to regulate the speech, per se. It's not the ads, anything peculiar about the ads themselves. It's just that they're ads. I mean, that's your problem. Your Honor, I think it's actually our strength, because it goes to the fact that we're not trying to regulate content here. We are trying to regulate the secondary effects, which the court has held. The secondary effects is the effects that it adds to the cost of putting out this, what you would regard as the First Amendment-protected part of this book. Your Honor, the court has said that there is a common-sense distinction between flyers with advertising and some limited content and newspapers. And that was in the Discovery Network's case. The court has said that there is an obvious distinction there. And, obviously, I certainly agree that there is line drawing to be made. I forget the statistics in their brief, but they had sort of caught my eye. There are statistics about what percentage of the newspaper, maybe it was the Seattle Times, is comprised of advertising. In fact, I've seen newspapers. There's one in the Eastern District called Newsday, which is published in the suburbs, and it's a leading newspaper in the suburbs, which is, I would guess, roughly 50% advertising, if not more, and less news. And, Your Honor, Bolger makes clear that when you're trying to determine if you're talking about inextricable intertwining of commercial speech, the test is not how much it weighs, and the test is not what the percentage is. Because if you look at the very pamphlet that was at issue in Bolger, an infinitesimal percentage, maybe 1% of the document, had the piece of it that was the commercial speech, which caused the court to rule that the entire thing would be judged and treated as commercial speech. So I think that the notion of weighing the Seattle Times and weighing the Yellow Pages is simply not the issue when you're determining if there's inextricable intertwining. I think also the notion, Your Honor. Complaining about waste. I mean, it's true that I assume the burden, but one of the more onerous tasks that I do in dealing with the garbage aspect of my domestic abilities is to tie up copies of the New York Times and the Wall Street Journal and put them out. And, Your Honor, neither of those. And once every six months I may put out last year's Yellow Pages. And, Your Honor, you pay for both of those publications to show up at your doorstep. Right. And I may not be dispositive at all, but I'm perfectly happy to get the Yellow Pages. And, Your Honor, this ordinance. And which I use from time to time. And, Your Honor, this ordinance doesn't. Remember, that's the problem. This ordinance, Your Honor, would not in any way stand in your way personally to continue to enjoy this publication. What this. It does because they're forced to pay for something that nobody else is forced to pay for. I mean, they have to pay $0.14 per copy delivered to my door. So they've got to pay $0.14 for the privilege of giving me something because somebody else out there apparently doesn't want it. And the court is. The New York Times isn't paying the $0.14. Well, the New York Times is something that you're paying for. So the issue doesn't arise with the New York Times. In this case, it's not. Our shopper is called Midweek Magazine. That's the one that takes up a lot more space than the phone book does. And I've got to move it to the trash can or to the newspaper bin each time. They're not paying anything. I see that I'm out of time. May I? We're taking you over time. We need help with this. This is a hard case. I'm happy to continue, Your Honor. Please do. Okay. I think that in the case of commercial speech, the legislative body is entitled to rely on the testimony that's supplied to it. That is a major distinction between commercial speech and non-commercial speech. And the hypothetical you propose is one that's not before this court in the sense of other publications where there's evidence that individuals find an invasion of their privacy when those are being delivered, despite their request that they not do so. And that record is really important here. That record is what buttresses and drives the purposes of this ordinance and the desire of the city to create a mechanism that will work, that will be effective in permitting those who wish to receive it to continue, and the many and the numbers have been outstanding, Your Honors, to who do not wish to receive it to make that choice and have it enforced. Because the system in place prior to the city's taking action was ineffective by their own terms. Mr. Berman mentions that, you know, really it was a very limited error rate, but that's not what their documents say. Their documents indicate that last year in the city of Minneapolis alone, they had a 10% error rate, which they didn't find to be acceptable. Well, certainly if they don't find it to be acceptable, the city would concur with that. The record in Seattle for the obeyance of opt-out directives that were made to their systems is higher. It's somewhere like in the 13, 14% rate. And again, Your Honor, I'm just basing it. That only is if you put it the other way, that it was 85% effective. Well, Your Honor. And they make a fairly persuasive argument that they have no interest in giving it to people who don't want it because it costs them money after all to print it. That they have no – it's in their interest not to give it to people who don't want to use it or throw it away. Your Honor, a 10%, 13% error rate does not reflect what the lawyers are telling you here is the corporate policy. It simply doesn't. Well, it may be, but it doesn't strike me that that's such a terrible error rate. If 13% or 14%, it means that 86% of the opt-outs are being honored and it's inevitable in a system of how they deliver these books that you're going to have mistakes made. With due respect, Your Honor, that is a decision to be made by the legislative body. They are entitled to make that decision. I don't know if the First Amendment is something the legislative body is entitled to decide for itself on. The interests we're talking about here are something that are not purely legislative. No, and I didn't mean to suggest that they decide the First Amendment issue. What I meant to say is that it's the legislative body's power and authority to decide at what percentage of error rate it is incumbent upon them to protect citizens who clearly have an interest in – a constitutionally recognized interest in stopping that speech from actually enforcing those rights. That is a legislative decision to be made, and there is no magical percentage number of error which would dictate when the city can act and when the city cannot act. Well, when the ordinance is one that charges, in this case, the plaintiffs, for distributing a phone book to somebody who may well affirmatively want it, I'm not sure that it's up to the city to decide what error rate is acceptable. I mean, the city says, we're going to be tolerance-free, we're zero tolerance, and so forth. If you don't get it entirely right, we're imposing this scheme, I don't think anybody would say, okay, they can charge the phone company 14 cents per copy for all the properly delivered phone books because one person got it who wasn't supposed to. And if the city council decides, nope, we're zero tolerance, nobody's going to believe it's up to them to make that decision. So, again, we have to make a decision that applies not just in this case. We're based on this record, but not just in this case and not just for this community. And, Your Honor, the First Amendment, even in a high-level speech, even where somebody is marching in a parade to set forth political opinions, the court has upheld the fee shifting there that is caused by the additional work that is required of the city or the county to deal with the speech of those individuals. And so the Constitution does not prohibit cities. Is half the 14 cents going to pay for ads that say opt out of yellow pages? It is going to ads that advise people of their rights that say, just as you indicated what the cover of these yellow pages say, if you wish to opt out, here's how you do it, here are the phone numbers. Not ads to encourage it, but ads to advise of rights. That is what makes the system effective in the hustle and bustle of noise today, that if people are going to exercise their rights, they need to know that those rights exist. And that is what the advertising is here. It's not a pom-pom shaking to encourage people to do something that they don't want to do. The city has been very clear that those individuals who want to use those will continue to. The city could place those ads on their own, couldn't they? I mean, the city is placing those ads, but they could do it without requiring the phone book companies to pay for it. Your Honor, they could, but the Constitution doesn't require them to do that. That's the position here, particularly given that this is commercial speech and not the high-level First Amendment speech where the courts have repeatedly indicated that it is acceptable. Your parade permit included charge to advertise in the newspaper to let citizens know if they didn't like parades disrupting traffic, they're entitled to let the city council know it and the city council may decide not to issue any more parade permits. Well, the courts have said that it has to have a reasonable relationship to the city purpose. And I think at some point you're going to go too far afield to be able to argue that that is a reasonable connection. There's a Ninth Circuit case where a judge was forced to pay for the voter pamphlet. That is a pro rata fee applied to the highest level of First Amendment speech. In other words, all of the judicial candidates had to pay for their pro rata share of this speech, which was then being delivered in voter pamphlets. The court held that that was an acceptable fee shifting and that counties and cities and states may pass that along and still be in compliance with the constitutional mandates. That operates to benefit the candidate, if I understand you correctly. Well, that wasn't the reason, though, that the court upheld it. The court didn't uphold it because it was something that benefited the individual. The individual had to pay for it because it was a service being provided to the residents. That is, to provide basic information about each candidate. So the service being provided by the city was not for the candidates. It was for the residents. We've worked you over time. I don't know if you get paid by the hour, but we appreciate your enlightenment of it. Do you concede that you lose if we disagree with you on whether it's commercial speech? Well, yes and no, Your Honor. I think that the Sorrell case has created a new issue for us that didn't exist before, and that goes to the notion of the opt-out system. The Sorrell case addressed whether in strict scrutiny the government can satisfy the explanation of the need when there is an existing industry system that is working relatively okay, where in that case the error rate was 20%. So I think that if strict scrutiny is applied, that piece of the ordinance would suffer. The other pieces of the ordinance, Your Honor, however, I do believe should be upheld under strict scrutiny. Thank you. And we ask that the district court denial of preliminary injunction be affirmed. I have, I believe, eight points that I'd like to make. If you give me time and if you don't, I will totally understand. As to Judge Corman's question, I think that was answered earlier in her argument when she said this is a commercial speech case. The district court could not have gotten to the result it did without erroneously concluding that commercial speech applied. They have one paragraph in their briefs below that tries to justify this under strict scrutiny. If you apply actual intermediate scrutiny, which the Supreme Court says in Bolger and Fox is not rational basis, but is something stronger than that, something that requires real meaningful purposes and really accomplishing them, it fails as well. Inextricably intertwined. That was created by the Supreme Court in a situation where the seller throws something in and the court says, well, if they didn't need to throw it in and if they're really still selling something, we're going to treat it as what it is, selling something. They turn it on its head and try to make it a sword here to justify not regulating the commercial effort, but regulating the non-commercial speech, putting just as much burden on the non-commercial speech. They target the whole ship. And then they have the gall to come here and tell you, well, if we sink the back half and the whole boat sinks, you shouldn't worry about the effect on non-commercial speech. That is not what the First Amendment is about. The First Amendment is about concern for that non-commercial speech, even for commercial speech, because that is such an important part of our lives as well. And the First Amendment, as you've pointed out, says you need a bright line and not a line that hides or is based upon content discrimination. Sure, we all have the same reaction that the court might have had, that yellow pages are different than newspapers. That's clearly what the city relied upon. That's their whole argument. And all that is is hidden content discrimination. We're simply imposing our value system, our judgment, as to what that non-commercial information is worth. And the First Amendment says that's not something that we get to do as legislators or as judges. There should be a safe harbor for the evolution of speech that is clearly inextricably intertwined with commerce. There are now station magazines by station companies. As much as they talk about what a bright line, they also say with regard to defining what's commercial speech, at some point they kind of throw their hands up and say, well, you take a common sense approach. Well, I don't think many people would mistake the yellow pages for a newspaper. There is a difference between them. We may have difficulty articulating what the difference is, but there is a difference. Now, why is it the publication that comes out in the form of the phone directory should be treated in the same way as the Seattle Times? Because what the district court did was to take, admittedly, perhaps a hybrid situation of a lot of non-commercial speech, predominantly non-commercial speech, and a significant amount of commercial speech, and it treated it in a binary fashion. We say, number one, that there has to be some limiting principle, some intellectually honest limiting principle that distinguishes this from the Seattle Times, and there isn't. They haven't come up with it. The district court didn't come up with it. But second, we say, even if you look at that hybrid situation and you say, yes, there's a lot of commercial speech here, you have to be sensitive to that in what scrutiny you apply. And it shouldn't just be minimal scrutiny, which is what the district court applied here, saying I defer to the legislature. She fell into the same trap of basically repeating the district court's position in that regard. There has to be meaningful scrutiny of the burden imposed on the non-commercial speech. And here that was not done. There should be at least a concern about the narrow tailoring, whether you could accomplish these objectives without all of the burden, all of the combination of regulations they apply. And when you talk about waste recycling as a government interest, remember that paper still is the most common and the most traditional means of communication. They want to have a stranglehold on that means of communication, and they want to apply it on a content discriminatory basis. And Sorrell is clear on that, that you cannot simply pick the commercial winners and losers that you want between everybody competing for advertising and discovery network as well, based upon the content of the non-commercial information. This case is different in the sense that the content is more form than substance. That is, this isn't viewpoint discrimination, which Sorrell talks about. Part of the problem with the phone book is there isn't an editorial point of view. The listings are bland information, valuable information perhaps, but still not expressing the kind of thing you expect Patrick Henry to stand up and be declaring to the community. Exactly, but there is no case that says mere information, mere useful information is not protected by full strict scrutiny under the First Amendment. And the district court made the mistake of, I believe, of confusing viewpoint discrimination, which you're correct, we do not allege that it is viewpoint discrimination that is present here, with content discrimination. He didn't think there was viewpoint discrimination, but clearly there is content discrimination. The ordinance on its face is targeted at books that have listings of contact information for businesses. That is the target. That is useful information. It is not commercial speech. It is not advertising, and that is a content discrimination. Ms. Goldman says that we didn't introduce your weekly shopper, but what we did introduce, and she forgets, is Professor Baldesty saying that there are lots of those things that are distributed to people's stoops when they don't have a no trespassing sign out, just like Yellow Pages. And we have their information reflected, I think, in the third Stone Cipher declaration, which they say there's 17 billion tons of unwanted information that goes to Seattle doorsteps, and we've decided to deal with 2% of it. Now, clearly there's a lot more out there, and Discovery Network, and Sorrell, and all of the Supreme Court cases, and frankly this Court's decision in the Berger case, make it clear that you cannot discriminate on that basis. The parade fee point she makes, again, content discrimination distinguishes that, and here you could narrowly tailor. It doesn't have to be the least restrictive, but you could clearly narrowly tailor if you're addressing mistake in delivery by saying that the reasonable fine when you make a preventable mistake in delivery will be enough to support the city's effort to enforce that reasonable time, place, and manner restriction, had they chosen to impose that. The error rate, they have nothing that suggests there's a 13% to 14% preventable real error rate here. They simply abuse the statistics, which suggests that some of the complaints were from Milwaukee or wherever. Some of them were from San Francisco. Many of them were from landlords who thought that they should be entitled to opt out their entire building, despite the fact that many people in that building might want to receive things. Many of them were from people who forgot that they had only opted out of one book, not another. Many of them were from people who had forgotten that they had opted out in one address and moved somewhere else. The error rate that the Supreme Court talks about in Brown, the leakage of retailers, commercial businesses, selling video games to minors, was 20% or 30%. And the court said the burden should be on the state to show that it is going to make a meaningful improvement on that and that that's beyond what is just going to happen. Now, this isn't strict scrutiny, but that should at least inform how intermediate scrutiny should apply here, and they should have some burden to show that there's some meaningful number of actual mistakes made and that that really contributes to the recycling burden or is really a privacy violation. It is not a privacy violation when you don't have a no trespassing sign and you let the whole world walk up to your doorstep. And to single out one First Amendment publisher and to say they can no longer walk up to your doorstep is simply unacceptable. The First Amendment requires a bright line and it requires a line that does not hide content discrimination. Thank you, Your Honor. Thank you. We thank both counsel for your helpful arguments in this complicated and difficult case. That concludes our argument calendar for the day, and we are adjourned. All rise.
judges: Clifton, Nr Smith, Cjj Korman (Edny), Dj